## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| SHON BROWN,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | CASE NO. 5:22-CV-01918-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION & ORDER** |

### INTRODUCTION

Plaintiff Shon Brown challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 26, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Oct. 26, 2022). On October 28, 2022, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to my exercising jurisdiction over this matter. (ECF #7). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Mr. Brown filed for DIB and SSI in January 2020, alleging disability onset dates, respectively, of February 20 and February 2, 2019. (Tr. 203-10). His claims were denied initially and on reconsideration. (Tr. 85-100, 103-116). Mr. Brown then requested a hearing before an

administrative law judge. (Tr. 140-41). Mr. Brown (represented by counsel) and a vocational expert (VE) testified before the ALJ on February 26, 2021. (Tr. 34-76). On May 25, 2021, the ALJ issued a written decision finding Mr. Brown not disabled. (Tr. 13-33). The Appeals Council denied Mr. Brown's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Brown timely filed this action on October 26, 2022. (ECF #1).

FACTUAL BACKGROUND

## I.  PERSONAL AND VOCATIONAL EVIDENCE

Mr. Brown was 50 years old on the alleged onset dates, and 52 years old at the time of the administrative hearing. (Tr. 243). He completed some college and earned his journeyman's card (Tr. 237) and has worked as a tool and die maker, mixer technician, machinist, and crane operator. (Tr. 71).

## II.  RELEVANT MEDICAL EVIDENCE

On March 13, 2019, Mr. Brown went to the emergency department after a week of chest pain and tingling in both shoulders and upper extremities. (Tr. 761). He reported having four drinks that morning and fell off a barstool. (*Id.*). He complained of head pain but could not recall whether he lost consciousness or any other events that occurred at the drinking establishment. (*Id.*). Mr. Brown was intoxicated at the time of examination and could not give specifics, but physical examination was normal except he was not oriented to time. (Tr. 762-63). A brain CT was normal, and a chest X-ray revealed hyperinflation and markings suggestive of early infiltrate in the bilateral pulmonary arteries. (*Id.*). He was diagnosed with a closed head injury with a brief loss of consciousness, acute alcohol intoxication with alcoholism, and a history of hypertension. (Tr. 766).

On July 11, 2019, Mr. Brown had a syncopal episode at work, lost consciousness, and hit his head, resulting in a laceration on his forehead. (Tr. 397). At the emergency department, Mr. Brown reported he did not have symptoms prior to the event and denied any current symptoms. (*Id.*). Mr. Brown's wife reported one prior episode on Super Bowl Sunday, but Mr. Brown refused to go to the hospital afterward. (*Id.*). Physical examination and EKG were normal, and he denied chest pain, pressure, and shortness of breath. (Tr. 397-98). Mr. Brown left the emergency department against medical advice after receiving an IV load of Keppra. (*Id.*).

On August 15, 2019, Mr. Brown underwent electroencephalography (EEG) testing to diagnose seizures. (Tr. 441). The EEG was normal, without clear seizures or seizure tendencies. (*Id.*).

On August 18, 2019, Mr. Brown reported to the emergency department two days after falling down a flight of 14 steps and endorsed a seizure after the fall. (Tr. 751). He complained of continued pain on the right side of his face with swelling and bruising. (*Id.*). Physical examination revealed right periorbital edema and ecchymosis and tenderness over the right zygoma, but otherwise Mr. Brown exhibited normal strength and sensation. (Tr. 752). A CT scan revealed a right zygomatic/maxillary fracture with air in the facial and neck soft tissues. (Tr. 758). He received antibiotics and was referred to an ENT but declined to schedule a follow-up appointment with a plastic surgeon. (Tr. 754).

On August 26, 2019, an MRI brain scan revealed minor periventricular white matter ischemic changes without evidence for acute infarction, focal mass, or hematoma. (Tr. 749).

On August 28, 2019, Lisa Humrighouse, PA-C, provided a Work Note stating Mr. Brown had a seizure on August 16 and was restricted to light duty and must refrain from using heavy machinery or working at heights until October 9, 2019. (Tr. 438).

On November 16, 2019, around midnight, Mr. Brown fell after drinking 7 beers. (Tr. 449). At around 4:30 a.m., his wife found him at the bottom of the stairs. (*Id.*). Mr. Brown arrived at the hospital that afternoon after drinking five more beers. (*Id.*). He reported being worked up for seizures but felt alcoholism was the main cause for his falls. (*Id.*). Mr. Brown also reportedly stopped taking Keppra three months before because he continued having seizures. (Tr. 447). He reported pain at the left clavicle but denied neck and back pain, shortness of breath, chest pain, and extremity numbness and tingling. (Tr. 449). Except the clavicle area, physical examination was normal. (Tr. 449-50). A CT brain scan revealed no acute abnormality. (Tr. 451). A chest CT revealed a comminuted, mildly displaced fracture of the left clavicular head with surrounding hematoma, additional fracture at the acromioclavicular joint, displaced left lateral fourth rib fracture, and hepatic steatosis. (Tr. 452). The treating provider felt Mr. Brown's fall was the result of his alcoholism (Tr. 450) and counseled him to make significant life changes. (Tr. 452). Mr. Brown received a sling and agreed to follow up with orthopedics. (*Id.*).

On May 7, 2020, Mr. Brown was brought to the emergency department after experiencing a syncopal episode and lost consciousness at work. (Tr. 480). A bystander reported "seizure-like activity" and EMS notes indicated Mr. Brown was awake but confused during transit to the hospital. (*Id.*). On examination, he knew he was at a hospital and that it was 2020 but could not identify the hospital or the month; physical examination was otherwise normal. (Tr. 481). He reported drinking eight to ten beers a day, but later reported twelve to fifteen a day, yesterday

being his most recent drink. (Tr. 482, 487). Radiology testing revealed remote fractures to the right

maxillary sinus and the fifth and sixth left posterior ribs. (Tr. 482). The treating physician was

concerned for alcohol withdrawal, seizure, syncope, and epilepsy, and thus admitted Mr. Brown

for further workup. (Tr. 483).

On May 8, 2020, during an inpatient consultation, John Collins, M.D., noted the

following:

> **Initial complaint(s)**: Patient had been at work when he noticed the onset of
> lightheaded sensation. He subsequently fell and lost consciousness getting[*sic*] his
> head on the floor. Bystanders noted seizure type activity with post event confusion
> as reported by EMS when they arrived on the scene. There was no note of any focal
> weakness, sensory changes, problems with his speech, or problems with the vision
> or swallow.
>
> . . .
>
> **Other history**: Patient does have a history of being[*sic*] and daily alcohol use (12-15
> beers daily). Patient has no desire to quit alcohol use currently. He has had the
> seizure activity in the past but the etiology is unclear. His last seizure was a grand
> mal in September 2019 with a total of 4 prior seizures. First seizure was in February
> of 2019. He had been on Keppra for seizure activity that was started by a
> neurologist this[*sic*] he had seen in Fairmont. However, patient discontinued
> Keppra because of side effects, which were confusion, fatigue, memory loss, and
> worsened seizures. He has had seizures while drinking and when not drinking
> alcohol.

(Tr. 491).

Except for left shoulder tenderness and limited range of motion, physical examination was

normal. (Tr. 493). Dr. Collins' overall impression was seizure disorder, alcohol abuse disorder,

hypertension, adverse reaction of Keppra, and left shoulder injury. (Tr. 495). In narrative, Dr.

Collins stated:

> Patient with [history of] seizures starting in February and ongoing with total of 5
> lifetime seizures. Unable to tolerate Keppra therapy and will switch to alternative
> medication. Patient's alcohol use will be a factor in his seizure control, but he will

> need AED therapy whether he continues to drink or not. No alcohol use recommended, but this will take a commitment on his part. Given likely use[,] will proceed with newer AED that should not have a significant interaction with alcohol.

(*Id.*).

Dr. Collins provided an IV loading dose of Dilantin and prescribed a daily dose for maintenance as well as folic acid and vitamin B supplements, recommended "alcohol use reduction since cessation not likely in short term," follow-up with neurology in four weeks for seizure management, and follow-up with physical therapy and orthopedics for the left shoulder injury. (*Id.*; Tr. 498). Upon discharge on May 9, 2020, Mr. Brown's treating provider emphasized he should avoid driving or operating heavy machinery until he sees a neurologist. (Tr. 498).

On May 21, 2020, Mr. Brown went to urgent care after a seizure. (Tr. 557). He reported drinking ten to twelve beers daily and was gradually trying to cut back but not interested in quitting. (*Id.*). He also reported some noncompliance with Dilantin, admitting to missing three to four doses the prior week. (*Id.*). Physical examination was normal. (Tr. 558-59). His urgent care provider, Anastasia Rowland-Seymour, M.D., switched Mr. Brown to Dilantin ER for better compliance. (Tr. 560).

Two days later, on May 23, 2020, Mr. Brown went to the emergency room after falling down ten to twelve steps. (Tr. 665). He admitted consuming multiple alcoholic drinks before falling. (*Id.*). He described the event as a seizure, but family witnesses reported no seizure-like activity. (*Id.*). He lost consciousness for an unknown period but was alert and oriented when EMS arrived. (*Id.*). Mr. Brown appeared inebriated and slurred his speech at the hospital. (*Id.*). He complained of right wrist pain and, on examination, had multiple abrasions to his arm, leg, and right hip, and mild tenderness to palpation of the right medial forearm. (*Id.*). Imaging revealed

6

right forearm fractures as well as a cervical fracture thought to be the result of arthritic change. (*Id.*). Lab results showed an elevated level of alcohol and a low level of Dilantin. (*Id.*). Mr. Brown declined to be admitted; instead, he received IV Dilantin and was later released after he demonstrated ambulating with a steady gait. (Tr. 666).

On November 12, 2020, Mr. Brown underwent tilt table testing, the results of which were compatible with vasovagal mediated/neurocardiogenic mediated symptoms without vasovagal mediated/neurocardiogenic mediated syncope. (Tr. 745). The symptoms Mr. Brown experienced during testing were dizziness upon standing, nausea, blurred vision, cool hands, feeling diaphoretic, and vomiting, but he did not lose consciousness. (Tr. 744).

On December 17, 2020, Mr. Brown met with cardiologist Paul Moodispaw, M.D., for evaluation of syncope. (Tr. 728). He reported he sometimes feels dizzy or lightheaded before an event but other times he has no warning. (*Id.*). Mr. Brown stated he can sometimes feel his heart working hard as if he was running a marathon. (*Id.*). He endorsed increased fatigue, random dizziness and occasional balance issues, dull chest pain, shortness of breath with activity and cough, left arm pain, lightheadedness, and syncope. (Tr. 730). Physical examination was normal. (Tr. 731). Based on the results of the tilt table study, Dr. Moodispaw considered autonomic dysfunction with vasovagal mediated physiology. (*Id.*). He diagnosed Mr. Brown with syncope, essential hypertension, alcohol use, precordial chest pain, and dyspnea on exertion. (Tr. 733). He also noted Mr. Brown stopped taking all his medications because he was not feeling well on them and felt they were contributing to his issues. (Tr. 732). Dr. Moodispaw ordered an EKG, a 30-day heart monitor, a complete echo study, a nuclear stress test, and a carotid duplex ultrasound and advised Mr. Brown to limit his alcohol intake significantly. (*Id.*).

7

On January 26, 2021, Mr. Brown met with cardiologist Nagapradee Nagajothi, M.D., and reported discomfort in the bilateral groin region radiating to his buttocks and weakness in his legs when walking about 100 feet. (Tr. 995). He also stated he was slowly cutting back his alcohol intake. (*Id.*). Dr. Nagajothi noted Mr. Brown's recent coronary angiography that revealed bilateral ostial common iliac artery stenosis. (*Id.*). Mr. Brown endorsed dizziness and balance problems, chest pain, bilateral muscle aches with walking, shortness of breath with activity, muscle weakness, joint pain, lightheadedness, and syncope. (Tr. 997). Physical examination revealed diminished and absent lower extremity pulses but was otherwise normal. (Tr. 998). Dr. Nagajothi diagnosed peripheral vascular disease and advised Mr. Brown to continue taking cilostazol, aspirin, and statin, stop smoking, and start a walking program. (Tr. 999). I note Dr. Nagajothi's treatment records refer to an abnormal stress test (Tr. 996), dated December 24, 2021 (Tr. 999), but the administrative record does not contain the results of the stress test.

## III.   MEDICAL OPINIONS

On August 19, 2020, state agency medical consultant W. Scott Bolz, M.D., reviewed Mr. Brown's medical records and determined he can occasionally lift and carry 20 pounds, 10 pounds frequently; can stand and/or walk and sit for six hours each in an eight-hour workday; can frequently climb ramps and stairs but never ladders, ropes, or scaffolds; can occasionally crouch; and must avoid all exposure to hazards including dangerous machinery, unprotected heights, and commercial driving. (Tr. 85-100). On October 7, 2020, Leslie Green, M.D., reviewed updated medical records and affirmed Dr. Bolz's opinion. (Tr. 103-15).

Dr. Moodispaw's Treating Source Statement, dated January 14, 2021, does not offer opinions about Mr. Brown's physical limitations but refers to the most recent office visit note. (Tr. 724-27).

On January 20, 2021, Mr. Brown's primary care physician, Eric Smith, M.D., completed a Treating Source Statement regarding Mr. Brown's mental functioning. (Tr. ). Dr. Smith stated Mr. Brown has difficulty with memory, concentration, persistence, and pace "due to syncope and alcohol use/history but not impaired concentration/ability to work with mind. Has limitations due to orthostasis." (Tr. 740-41). He opined Mr. Brown could maintain concentration and persistence for over two hours at a time and could maintain regular attendance and be punctual within customary tolerances, but would be off-task 25% of the workday and absent more than four days a month due to syncope. (Tr. 740-43).

On February 5, 2021, Dr. Smith completed a Treating Source Statement regarding Mr. Brown's physical functioning. (Tr. 790-93). He offered the following opinions: Mr. Brown would be off task more than 25% of the workday and absent more than four days a month; can pay attention for less than 30 minutes at a time; lift and carry 20 pounds occasionally, 10 pounds frequently; sit for eight hours and stand/walk for zero hours of an eight-hour workday, and needs the option to sit or stand at will and elevate his legs while sitting; frequently reach bilaterally; occasionally push and pull on the left; never operate foot controls; never climb stairs, ramps, ladders, ropes, or scaffolds; never balance, crouch, or crawl; rarely stoop and kneel; have frequent exposure to pulmonary irritants, occasional exposure to humidity, and no exposure to heights, moving machinery, driving, extreme temperatures, or vibration. (*Id.*). Dr. Smith explained that, due to severe peripheral arterial disease (PAD), use of legs to support his weight results in reduced

9

blood return, syncope, and pain, and Mr. Brown would need the ability to lie down every 30 minutes to 1 hour for about 10 minutes at a time. (Tr. 791). Dr. Smith also noted Mr. Brown required operation/grafting surgery for PAD but could not afford it and was not insured. (Tr. 792).

## IV.   ADMINISTRATIVE HEARING

Mr. Brown was terminated from a long-standing position (2013-2019) (Tr. 46) for sitting and sleeping on the job. (Tr. 47). Mr. Brown denied he was terminated for alcohol-related issues. (*Id.*). More recently, he was fired after two convulsive episodes because he could not perform the position within his doctor's prescribed functional limitations. (Tr. 45). About two months before the hearing, Mr. Brown began weaning his alcohol intake and, at the time of the hearing, estimated he consumed 2 to 3 beers daily, sometimes none at all. (Tr. 57).

Mr. Brown cannot work because he suffers from convulsions, once thought to be seizures, possibly related to arterial blockages. (Tr. 53). Typically, Mr. Brown experiences 2 to 3 convulsions in a month-long period and then does not have any for 2 to 3 months thereafter. (Tr. 70). Mr. Brown does not recall his symptoms during these episodes, but his wife and co-workers say he acts normal and then drops to the ground without warning. (Tr. 55). Mr. Brown has some memory loss after a convulsion. (*Id.*). Mr. Brown cannot identify any warning signs preceding a convulsion. (Tr. 67). Between episodes, Mr. Brown experiences shortness of breath with exertion and needs to sit or take a nap. (Tr. 55). On other days, Mr. Brown does not need a nap. (*Id.*). Three to four days a week, Mr. Brown is awake just three to four hours a day. (Tr. 68). Otherwise, Mr. Brown has no other cardiac-related issues. (*Id.*).

Mr. Brown's cardiologist prescribed Plavix and Lipitor and suggested he wear compression socks to help with blood flow. (*Id.*). Despite the treatment, Mr. Brown reported he had an episode two weeks before the hearing where he remained unconscious for thirty minutes and did not remember anything until the next day. (Tr. 57-58). The doctor also limited Mr. Brown to lifting 10 pounds. (Tr. 60). Mr. Brown has tried medical marijuana but stopped after one month because it was not effective. (Tr. 62).

Mr. Brown has a history of falls and resulting fractures and, as a result, feels aches and pains. (Tr. 59). He attributes the falls to his convulsions and denies ever falling while drinking. (Tr. 61-62). On a good day, Mr. Brown can stand comfortably for two hours before needing to sit down and can lift and carry a gallon of milk for fifteen feet. (Tr. 68-69). He believes it would exhaust him to carry two gallons of milk an equal distance. (Tr. 69). Mr. Brown tried shoveling snow a few weeks before the hearing and it took him three hours to complete a job that normally takes 45 minutes. (Tr. 65). He had to intermittently take rest breaks inside. (*Id.*). Mr. Brown stopped chopping wood after August 2020 but can attend to his personal hygiene, do household chores, and care for a puppy. (Tr. 63-64). Mr. Brown's wife does most of the grocery shopping, but Mr. Brown will occasionally go to the store for a few items. (Tr. 64).

Then VE Lynn Smith testified. She identified Mr. Brown's past relevant work as follows:

- Tool and die maker (DOT #601.281-010; medium as generally performed, heavy as actually performed; skilled SVP 7);

- Mixer technician (DOT #550.685-078; heavy as generally performed, medium as actually performed; SVP 3);

- Machinist (DOT #600.280-018; medium as generally and actually performed; skilled SVP 6); and

- Crane operator (DOT #921.663-010; light as generally performed, medium as actually performed; SVP 5).

(Tr. 71).

**Hypothetical Individual 1.** The ALJ asked if a hypothetical individual of Mr. Brown's age, education, and experience could perform Mr. Brown's past relevant work if limited to light exertion and restricted as follows: can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; can be frequently exposed to poor ventilation from pulmonary irritants such as dusts, odors, fumes, and gases, and occasionally exposed to extreme temperatures, humidity, and vibration; and must avoid all exposure to extraordinary workplace hazards such as unprotected heights, moving mechanical parts, and driving. (Tr. 72). The VE testified in the negative but identified three light, unskilled SVP 2 positions the hypothetical individual could perform:

- Mail clerk (DOT #209.687-026; 75,000 jobs nationally);

- Cashier (DOT #211.462-010; 1.5 million jobs nationally); and

- Garment sorter (DOT #222.687-014; 300,000 jobs nationally).

(Tr. 72-73).

**Hypothetical Individual 2.** If, in addition to the restrictions above, the hypothetical individual was limited to performing complex tasks but not at a production rate pace or quota, he would still be able to perform the previously identified light jobs. (Tr. 73).

**Hypothetical Individual 3.** If further restricted to standing and walking for four hours in an eight-hour workday and allowed to alternate between sitting and standing at 30-minute intervals; frequently push, pull, reach, and operate hand controls with the upper extremities; and occasionally push, pull, and operate foot controls with the lower extremities, the individual could

not perform the previously-identified jobs because he would be limited to sedentary work. (Tr. 73-74).

Hypothetical 4. Finally, if subject to the limitations in Hypothetical 2 and further restricted to lifting and carrying 10 pounds, the hypothetical individual would be restricted to sedentary work. (Tr. 74).

The VE further testified employers typically tolerate an employee being off task no more than 10% and absent no more than once per month. (Tr. 75).

## THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.  The claimant has not engaged in substantial gainful activity since February 20, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: closed head injuries, seizures, syncope, peripheral artery disease (PAD), and alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: He can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. He can frequently balance, and can occasionally stoop, kneel, crouch, or crawl. He can work in a setting with no more than frequent exposure to poor ventilation or pulmonary irritants such as fumes, odors, dusts, or gases. He can work in a sitting with no more than occasional exposure to extreme temperatures, humidity, or vibration. He must avoid all exposure to extraordinary workplace hazards such as unprotected heights, moving

mechanical parts, or commercial driving. Due to the symptoms of his physical impairments, he cannot perform tasks at a production rate pace or with strict production quotas.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on January 8, 1969, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from February 20, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

14

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

16

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Brown claims the ALJ's RFC is not supported by substantial evidence because the ALJ did not properly evaluate Dr. Smith's medical opinion. (Pl.'s Br., ECF #9, PageID 1064). Specifically, Mr. Brown argues the ALJ did not sufficiently analyze either the supportability or consistency of the opinion and did not point to specific evidence that would undermine any of the limitations contained within the opinion. (*Id.* at PageID 1068). He argues this is not harmless error because, "[h]ad Dr. Smith's opinion been properly evaluated, it would have been found persuasive and eliminated the ability to perform any light work under the RFC. The standing and walking limitations opined by Dr. Smith would preclude light work." (*Id.* at PageID 1069).

A claimant's RFC is an administrative assessment of the extent to which the claimant's impairments and related symptoms may cause physical or mental limitations or restrictions that may affect the capacity to do work-related activities. SSR 96-8p, 1996 WL 374184, at *2. The RFC must be based on all relevant evidence in the case record, including but not limited to medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, recorded observations, medical source statements, and the effects of symptoms. *Id.* at *5.

Because Mr. Brown filed his applications after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. §§ 404.1520 and 416.920c. Under these revised regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions

17

and all of the prior administrative medical findings in [the] case record." *Id.* at §§ 404.1520c(b); 416.920c(b).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5); 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[1] and consistency.[2] 20 C.F.R. §§ 404.1520c(a); 416.920c(a). An ALJ must explain how he considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3); 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ did not consider those

---

[1] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[2] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-CV-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Agency regulations no longer require deference to a treating physician's opinion, but the reason-giving requirement still exists so claimants (and reviewing courts) may understand the disposition of their claims. *See Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (applying the reason-giving requirement "with equal force to the new regulations, which require explanations for determinations that a medical opinion is unpersuasive."). Agency regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021). While the new regulations may be less demanding than the former rules, "they still require that the ALJ provide a coherent explanation of [her] reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). And "because of the greater latitude afforded ALJs under the new regulations, the importance of cogent explanations is perhaps even more important." *Hardy*, 554 F. Supp. 3d at 908.

Here, the ALJ found Dr. Smith's opinion unpersuasive, stating:

The stated limitations appear to be based to some substantial degree on the claimant's subjective reports, while the objective medical evidence relating to the relevant conditions remains limited and treatment remains conservative. The

> opinion also does not appear to take into account the impact of the claimant's noncompliance with treatment, in addition to his continued alcohol abuse.

(Tr. 24).

Elsewhere, in evaluating the state agency medical consultants' opinions, the ALJ determined:

> The record does not support further reductions in standing/walking, with peripheral artery disease only recently diagnosed and no objective findings suggesting significant limitations in his ability to stand and walk. Indeed, it is noted that the cardiologist recently advised him to start a walking program.

(Tr. 23). He also noted Mr. Brown's reported daily activities as of August 2020: "[h]e reported he gets up, smokes, takes a shower, watches the news, cleans, does laundry and yard work, cuts and stacks wood, and goes camping sometimes." (*Id.*).

In summary, the ALJ concluded as follows:

> As a whole, the record in this case demonstrates: infrequent seizures in the context of continued alcohol abuse and medication noncompliance; injuries from falls associated with alcohol abuse, but with no follow up treatment to indicate that the injuries have any significant ongoing impact; some work after the alleged onset date repairing, cutting, and preparing dies for delivery, described as heavy exertion work; and a recent diagnosis of peripheral artery disease, treated conservatively with medications and advice to stop smoking and start a walking program. Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the medical evidence of record, medical source opinions, and the claimant's activities of daily living.

(Tr. 25).

Here, "reading the decision as a whole and with common sense," the ALJ properly articulated how he considered the supportability and consistency of Dr. Smith's February 2021 medical opinion. *See Pritt v. Comm'r of Soc. Sec.*, 1:21-cv-1728, 2022 WL 2135304, *13 (N.D. Ohio June 14, 2022); *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (recognizing that the ALJ's analysis may be found throughout the decision). In assessing whether a

medical opinion is supportable, "the focus is on the relevance of the objective medical evidence and supporting explanations upon which the opinion is based." *Hale v. Comm'r of Soc. Sec.*, 1:20-CV-240, 2022 WL 909021, at *4 (E.D. Tenn. Mar. 28, 2022). To support his opined limitations, Dr. Smith does not cite to objective medical evidence or clinical findings, relying instead only on Mr. Brown's diagnoses of syncope and PAD and that such conditions can cause symptoms. (Tr. 791-93).

A diagnosis does not constitute objective medical evidence. *See* 20 C.F.R. § 404.1529(c)(2) (providing that objective medical evidence is evidence obtained from the application of medically acceptable clinical and diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit, or motor disruption). Additionally, the administrative record does not contain Dr. Smith's treatment notes regarding syncope or PAD, without which the ALJ cannot compare the opinions with Dr. Smith's clinical findings. However, in his January 2021 opinion regarding Mr. Brown's mental functioning, the evaluation of which Mr. Brown does not challenge, Dr. Smith cited to tilt table testing as supportive of his syncope-related mental limitations. (Tr. 22). In relation to tilt table testing, the ALJ noted elsewhere in the decision that the reviewing cardiologist only recommended that Mr. Brown maintain adequate hydration and consider compression stockings. (*Id.*). Read as a whole, I find the ALJ's decision adequately articulated how she considered the supportability of Dr. Smith's opinions.

Turning to the ALJ's evaluation of the consistency of Dr. Smith's opinions, I conclude the ALJ did not err. Consistency denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." *Hardy*, 2021 WL 4059310, at *3. Throughout the decision, the ALJ noted the limited objective medical evidence

regarding Mr. Brown's relevant conditions, including normal physical examination findings. (Tr. 21, citing Tr. 397-98, 449-50, 752, 762-63; Tr. 22, citing Tr. 481, 493, 558-59). The ALJ also noted Mr. Brown's treating cardiologist, during an appointment for PAD, noted diminished and absent bilateral lower extremity pulses and still recommended Mr. Brown stop smoking and start a walking program (Tr. 23, citing Tr. 999), inconsistent with Dr. Smith's opined limitations. Reviewing the decision as a whole, the ALJ adequately articulated how Dr. Smith's opinions were inconsistent with other substantial evidence in the record. Because the ALJ articulated how he considered the supportability and consistency of Dr. Smith's February 2021 opinion, I conclude that substantial evidence supports the ALJ's decision and thus Mr. Brown's assertion of error is without merit.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: September 7, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE